The case, now here on writ of error to the Vernon County Circuit Court, was originally here on appeal, set on the docket for October 10, 1933, at the October term of that year, but on October 6, 1933, appellant, Missouri-Kansas-Texas Railroad Company, dismissed its appeal and, on November 2, 1933, sued out the above mentioned writ of error returnable to the present term.
Within the time required, plaintiff in error filed its printed abstracts and briefs. Point 1 of the brief of defendant in error is that the abstract of plaintiff in error fails to show in its bill of exceptions that any exception was saved to the overruling of the motion for new trial.
We note that while the printed abstract of the plaintiff in error does not show, in its abstract of the bill of exceptions,
that any exception to the overruling of the motion for new trial was made, yet in the record proper, at the place where the overruling of the *Page 809 
motion for new trial is shown, it appears that "on the 15th day of February, 1933, the same being the third judicial day of said court, said motion for a new trial was taken up and considered and was by the court overruled, to which ruling and actiondefendant at the time excepted and now excepts."
The amendment of April 4, 1932, to our Rule 15 reads:
"If in any case any matter which should properly be set forth in the abstract as a part of the record proper, shall appear in the abstract as a part of the bill of exceptions, or vice-versa, such matter shall be considered and treated as if set forth in its proper place, and all objections on account thereof shall be deemed waived, unless the other party shall, within ten days after the service of such abstract upon him, specify such objections and the reasons therefor in writing and serve the same upon the opposing party or his counsel, . . ."
It will be observed that unless the other party objectswithin ten days after the service of the abstract upon him, all objections on account of the matter not being in its proper place "shall be deemed waived." This was not done. Indeed, nothing was done until on October 6, 1933, nearly thirty days after the time of service of such abstract, when a so-called "motion to dismiss appeal" was filed, but which stated no reason for such motion or action and, under our rule, we must regard the point made as having been waived under our said Rule 15. This renders it unnecessary to go into the validity of the trial court's nuncpro tunc order showing such exception was made under the rules of said court and was entitled to go into its proper place in the abstract. Said point 1 of defendant in error is disallowed.
On its merits, the case is over the validity of a judgment for $282 rendered on a verdict returned by a jury for loss alleged to have been negligently caused by the plaintiff in error, The Missouri-Kansas-Texas Railroad Company, in the acceptance for transportation of 4700 chicks which were by the railroad's agents and servants allowed to become injured and many of them, perhaps all, to die.
The petition, after alleging the existence of the railroad as a common carrier, further alleged:
"That on the 21st day of July, 1930, the United States Post Office Department, through its officers, agents and servants, at Nevada, Missouri, for a valuable consideration, contracted with and agreed to transport, and caused to be transported, over the lines of the defendant, Missouri-Kansas-Texas Railroad Company, a connecting carrier with the said United States Post Office Department, to a number of points along the lines of the defendant and along other connecting lines, forty-seven hundred chicks (4700), of the value of two hundred eighty-two and no-100 dollars ($282.00).
"The plaintiff further says that he delivered said chicks to the officers, agents and servants of the said United States Post Office Department, and that they, the said officers, agents and servants of the *Page 810 
said United States Post Office Department, in line of their duty, and under authority of the said United States Post Office Department, accepted said chicks for shipment, as aforesaid, and delivered all of said chicks in good condition to the officers, agents, servants of the defendant, at Nevada, Missouri, for the purpose of being shipped, as aforesaid; that the said defendant, through its officers, agents and servants, and in pursuance of its obligation as a common and connecting carrier, and in pursuance of its duty to the plaintiff, as such common and connecting carrier, received said chicks in good condition, for the purpose of being transported and shipped as aforesaid.
"The plaintiff further says that said checks were delivered to the defendant, as aforesaid, in time to have been placed aboard one of the defendant's trains within a very short time after said delivery for shipment, as aforesaid, but that the agents and servants of the defendant in charge of its business, being duly authorized to receive and transport said chicks, negligently, carelessly and wantonly failed to place said checks aboard said train for shipment, as was the duty of the defendant, its agents and servants, so to do.
"The plaintiff further says that at the date and time of the delivery of said chicks to the said defendant, as aforesaid, the weather was extremely hot, making it dangerous and hazardous to the health and life of said checks unless placed aboard a train for shipment, or unless kept in a cool and open space; that the defendant, its officers and agents, knew, or by the exercise of ordinary care could have known, of the condition of the weather at the time of the reception of said chicks for shipment, as aforesaid, and knew, or by the exercise of ordinary care could have known, that said chicks would be injured and caused to die if confined in a hot or unventilated room or place; that the officers, agents and servants of the said defendant, notwithstanding the knowledge of said facts caused said chicks to be delayed in shipment, and caused the same, while so being delayed, to be confined in a hot room, without ventilation, for a period of from six to eight hours, and that because of said negligent handling, and confining of said chicks, the same became overheated and died, to the plaintiff's damage in the sum of two hundred and eighty-two and no-100 dollars ($282.00)."
The answer was a general denial.
The evidence in behalf of the plaintiff, originally so-called, in the case, now the defendant in error, is, in substance, as follows:
John D. Graves, assistant postmaster at Nevada, and in the employ of that department for thirty-two years, testified that on July 21, 1930, he had a messenger that delivered mail to the railroad at that city; that said railroad carried, and now carries, mail for postoffices in the United States and the United States postoffice receives mail from it; that plaintiff Skaggs had been shipping chicks and —
"I sent a couple of clerks down to weigh them up and stamp them, *Page 811 
and on each box of chicks to put a `special handling' stamp and these chickens were supposed to be given first-class service, and they had been in the habit of doing that on Monday, and this Missouri Pacific train leaves the depot something like 9:40 — or did at that time; they had over a hundred boxes of chickens this particular Monday and didn't get them all off on this train; so the next best connections for St. Louis was over train 4; I didn't know there was anything wrong with the chickens until Mr. Dickerson called me about 6:30 and said those chickens that were down there for the Missouri Pacific train were in such a condition that the clerks refused them."
Witness further testified that Mr. Thompson, the M.-K.-T. station agent in Nevada, called him, and he (witness) took Thompson in the automobile to the depot; they found the chicks "in a bad state; a lot of them were dead and smelled bad. It was a hot day and the chicks had been confined in the baggageroom at the station." It was "along about 6:30 in the evening." The "Katy No. 4" left Nevada on that date about 11:30. Witness talked to the agent Thompson who "blamed the boy Jim Davis," said he was the cause of it as he should have put the chicks on M., K. T. Train No. 4; Thompson sent for witness because the latter was acting postmaster, the postmaster being sick in bed; most of the chicks were for Kansas City connections, the others were for St. Louis.
Witness did not know when the chicks were delivered to the depot, but clerks sent down to the hatchery to collect postage on them got back to the postoffice before eleven o'clock (whether A.M. or P.M., is not stated), these chicks are supposed to have special handling and receive the same care as letter mail.
James M. Davis, who was employed by the M.-K.-T. railroad from about June 1, 1928, to August 1, 1930, and who was day baggageman on July 21, 1930, the day of the attempted shipment, testified that on that day chicks were received from Mr. Skaggs to be shipped on the first train going in any direction they desired to go, which, in this case, would have been "Katy number 4" going north. The chicks were delivered before the train left, but they were not put on the train because witness "didn't have time to put them on the train." They were put in the baggageroom, the doors of which were closed. It was a hot day. Witness went off duty at one o'clock in the evening, he had been "handling this chicks mail and putting them on the M.-K.-T. trains." He testified he was not employed by the United States Government in any way; the M., K. T. railroad employed witness and paid his wages. Witness was under Mr. Thompson, the station agent; doesn't know how many chicks were delivered that day by Mr. Skaggs, "several boxes; I don't know how many, some of them to go south." Witness put the ones to go south on Missouri Pacific train that "went through about twelve o'clock, or 12:15 — I don't remember the number of the train." Witness further testified if chicks were received just before train No. 4 of the *Page 812 
Katy and some chicks were for Kansas City and some for St. Louis, he would put them all on that train "if I had time." Witness did not know when changes could be made, but thought they could be made at Clinton and Windsor and maybe at Sedalia. Witness testified he was discharged by the company after this, because of "something to the effect that I mishandled, or failed to load, the chicks on number four on this date." Over the objection of the defendant railroad, witness was allowed by the trial court to say that the officer who conducted the investigation of witness on this charge, said "I (witness) should have held the train until I got the chicks on."
On cross-examination witness said the postal messenger, Mr. Adams, brought the chickens to the depot. Witness didn't know the different places where the chicks were going, "just north and east, different points, most of them for Kansas City." The chicks were delivered in two lots for the train "that went north at nine something — they came to the baggageroom after that train left." The cross-examination of said Davis continued:
"Q. Mr. Adams brought them in the truck that he uses to carry United States mail? A. Yes, sir.
"Q. And how many loads did he bring? A. I couldn't say exactly; I wasn't there all the time.
"Q. Well you were handling the baggage and mail for train No. 4 — Katy train No. 4? A. Yes, sir.
"Q. Now were there any chicks there for train No. 4 when you got your baggage and mail ready for that train? A. I don't understand the question.
"Q. Were the chicks there when you got ready to work that train? A. No; there was some that came in just when the train was coming in.
"Q. That was too late for you to put them on? A. Well, that is what I thought.
"Q. Well wasn't that a fact? Now those chicks that came there — he brought them in on this truck that he uses for carrying United States mail, and unloaded them there from that automobile truck onto the truck that you use to load mail and baggage on the train? A. Yes, sir.
"Q. Now he did that after the train came in? A. No; the train was coming up to the station.
"Q. As he was doing that? A. Yes, sir.
"Q. Now did you know anything about where these chicks were going? A. I didn't know where they were to go.
"Q. You didn't know anything about them until the train pulled out, except you saw him unloading some of them there at the depot? A. Yes, sir.
"Q. Now then they were the chicks that were left — I mean that didn't get loaded on the train? A. Yes, sir. *Page 813 
"Q. I mean that he brought them too late for you to put on the train? A. Yes, sir.
"Q. Now after the train had gone you looked at that? A. Yes, sir.
"Q. You ascertained where they were going? A. Yes, sir.
"Q. Do you know how many there were? A. No; I don't know how many there were.
"Q. Now were some of them going south? A. Yes, sir; I think a few went south.
"Q. Going to Oklahoma and Arkansas, weren't they? A. A few, sir.
"Q. Now you had to separate them to ascertain where they were going? A. Yes, sir.
"Q. And you did that? A. Yes, sir.
"Q. Now then, the next train that came in was the Missouri Pacific train going south? A. Yes, sir.
"Q. Now, after you couldn't get them off on that train, what did you do with them? A. Put them in the baggageroom.
"Q. Tell the jury what kind of care you took of them. A. Well, there is platforms in the baggageroom to lay mail and boxes and such as that on; I stacked them in there and placed them on the platform.
"Q. Did you separate them so they would get all the ventilation they could? A. Certainly.
 "REDIRECT EXAMINATION BY MR. HALLETT.
"Q. Mr. Elliott asked you if they were there too late; you have told the jury the officers have told you it was your duty to even have held the train to load those chicks? A. They told me at Boonville.
"MR. ELLIOTT: We object to the testimony of what the officers told him afterwards.
"OVERRULED. EXCEPTION.
"Q. Who did you receive those chicks for, for what company? A. Well, it was both companies; they go out on the first train out.
"Q. These particular chicks that were left there who were you receiving for? A. Katy was the first train out.
"Q. Were you paid by anyone but the Katy? A. No, sir.
"Q. Employed by nobody except the Katy? A. No, sir."
Witness, on recross-examination, stated he received the chicks as United States mail.
Mr. Skaggs, who brought the suit, called as a witness in his own behalf, testified that he had lived in Nevada, Missouri, five years, was in the hatchery business and had been engaged in said business about fifteen years. Was operating a hatchery business in Nevada, Missouri, on the 21st day of July, 1930; witness said he delivered the chicks to the mail carrier, Mr. Adams, at the hatchery; two clerks came to the hatchery, "weighed them up and stamped them and put the special handling tickers on them; they mean that the shipment" is supposed to be handled just like special mail, first class handling. *Page 814 
Witness testified he next saw the chicks about 6:15 that evening; his place of business was about six blocks from the station, there was a telephone, both at witness' place of business and at his home; when he saw the chicks at this time (6:15 P.M.) they "were down on the truck at the station depot; the train had turned them down."
Witness testified he knew the reasonable value of the chicks left there not shipped out; those 4700 chicks would be worth six cents apiece, or $282; they weren't worth anything after he discovered them down at the station that evening, a lot of them were dead; when he took the others home, most of them died; some of the others were shipped out but they too died and witness had to replace them to the customer.
On cross-examination, Mr. Skaggs testified the cases, 100 chickens to a case, all left the hatchery about eleven o'clock that morning; "we started getting off chickens (around 12,00) early in the morning and had them ready for the postoffice clerks;" were getting chickens ready for shipment as early as three o'clock in the morning.
In this particular shipment there were forty-seven cases, 100 chicks to a case; some of them were to go to St. Louis, some to Illinois; some to Ohio; part of them up to Nebraska; but he couldn't say how many were going to each particular place; they should have gone out on the first train out that would make connections; they could be sent up the road and make connections at other towns.
On redirect examination, witness said his hatchery burned since this shipment, together with all his records, and gave that as his reason for not being able to give just the number going to each place. All were shipped except the 4700, they not getting on the train, were put down in the baggageroom and locked up.
Mr. Adams, messenger of postoffice department, testified that it was the custom for him to go to the hatchery on Monday about nine o'clock, collect shipment and deliver chicks to depot instead of taking them to the postoffice, there rehandling them and taking them back to the depot; he went around as usual, hauled some chickens to the Missouri Pacific that went north; then he hauled, what they had ready, to the depot "for the number 4 Katy that was going north around 11:30, and if I remember correctly I had them there between eleven and — about 11:15 I had the chickens all over there" except about ten boxes which were then brought "and at that time No. 4 was there right at the depot, or was arriving." The chicks were delivered to Mr. Davis, the day baggageman.
It was further shown by plaintiff Skaggs that the effect on chicks left from that time, 11:15 to 11:30 A.M., until evening, if confined in a close room like a baggageroom in a railway station, if the temperature were high as it was that day, the chicks would smother in about three hours; the chicks must have been in there over four or *Page 815 
five hours, he thought. The weather reports for July 21, 1930, showed the highest temperature to be ninety-nine degrees.
No testimony, other than that offered in the plaintiff's behalf was introduced; none was offered by the railway company. However it offered a demurrer to the evidence and moved the court to instruct the jury to find for the defendant.
The theory of defendant is that the chicks were in transportation by the United States Mail and while engaged in such transportation the defendant was neither a private nor a common carrier but an agent of the Government and no privity of contract existed between the plaintiff and the defendant.
It is no doubt true that Skaggs, the owner of the chicks and the one who suffered the loss occasioned by the death of the chicks arising out of their being improperly handled by the baggageman and other station agents of the railway company in change of its depot at Nevada, had no contract with the railway company for the transportation of the chicks. But this case is not founded upon the violation of an express contractual obligation, but for a breach of a public duty whereby Skaggs suffered the direct personal loss sued for. [Sawyer v. Corse, 94 Am. Dec. 445, 447.] This case holds that a contractor with the Postoffice Department for the carrying of the mail is liable to a third person for a loss occasioned by negligence in the performance of his, or its, duties, or for a loss caused by the negligence of a mere private agent and servant employed by the contractor-carrier to assist in performing the details of such contracted carriage. [See also Pryor Brown Transfer Co. v. Gibson, 290 S.W. 33; Central Railroad, etc., Co. v. Lampley,76 Ala. 180, star p. 357; Raisler v. Oliver Co., 97 Ala. 710; Barker v. Chicago, Peoria, etc., Ry. Co., 243 Ill. 482; Mellor v. The Missouri Pac. Ry. Co., 105 Mo. 455.]
We are not herein attempting to subvert the rule, well established by the decisions of many courts, that a public officer or other governmental agency is not responsible for the acts or omissions of a subordinate, who also serves the Government. But this rule cannot be invoked by a person or corporation undertaking by contract to render a service for the Government for a compensation to be paid to it, and the negligence complained of is committed by its subordinates who are employed and paid by it and liable to be discharged at its pleasure. In the case at bar, the railway company is not a public officer nor an officer of the Government, though in a certain sense, an agent of the Government engaged in the work of carrying the mails for a compensation due it, but the baggageman who negligently caused the loss was not an agent of the Government. Whose work was the baggageman doing when he carelessly failed to load the chicks on the train and then still more negligently put the chicks in a close and suffocating place where it could reasonably be apprehended that they would die or be so injured as to cause the remainder *Page 816 
not yet dead to die thereafter? Who was the master at the very time of the negligent act? The answer to both of these questions is, the M., K. T. Railway Company. The petition alleges these facts, and although it states that the railway company was a common carrier, yet the negligence charged is that the servants of the railway negligently failed to promptly place the subjects to be transported on the train and then negligently placed them in the baggageroom under such conditions as to cause their death.
The case of Bankers Mutual Casualty Co. v. Minneapolis, St. Paul, etc., Ry. Co., 117 F. 434, is not at all similar to the facts in the case at bar. That was the case of a theft of a mailed envelope, containing money, from a mail sack while it was in the possession, exclusive care, custody and control of the postal clerks or authorities, that is, the Government Mail authorities. It is wholly unlike the case at bar. The same is true of the other cases cited by the railway company in support of its position, namely, Boston Ins. Co. v. The Chicago, Rock Island, etc., Railway Company, 116 Iowa 423, where a postal clerk was negligently injured by a porter who, at the time, wasunder the control and direction of a postal clerk, hence he was not, at the time of the infliction of the injury, a servant of the railway, and the latter could not be held liable under the doctrine of respondeat superior. The other case is Denton v. Yazoo M.V.R. Co., 52 U.S. Sup. Ct. Rep. 141, l.c. 142. The United States Supreme Court, in deciding the above cases, quotes from Standard Oil Co. v. Anderson, 212 U.S. 215, l.c. 220, where the same court said:
"The servant himself is, of course, liable for the consequences of his own carelessness. But when, as is so frequently the case, an attempt is made to impose upon the master the liability for those consequences, it sometimes becomes necessary to inquire who was the master at the very time of the negligent act or omission. One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation. . . .
 "*309
"*To determine whether a given case falls within the one class or the other, we must inquire whose is the work being performed, — a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking. . . .
"In many of the cases the power of substitution or discharge, the payment of wages and other circumstances bearing upon the relation *Page 817 
are dwelt upon. They, however, are not the ultimate facts, but only those more or less useful in determining whose is the work and whose is the power of control."
Under the facts in this case, we are of the opinion that the rule or principle contended for in the demurrer to the evidence and in the motion for a directed verdict for defendant, does not apply.
Neither is plaintiff's instruction No. 2, on which the case was submitted, based on the theory that defendant, as a common carrier, was engaged in the transportation of the United States Mail and was liable for the negligence of one of its subordinates. The instruction told the jury that if on July 21, 1930, the defendant was a common carrier, that the United States Postoffice Department through its agents at Nevada, Missouri, for a valuable consideration, contracted and agreed to transport, and cause to be transported, over the lines of defendant railroad company, certain chicks, then the property of plaintiff; that —
"The defendant, through its officers, agents and servants, received from the United States Post Office Department said chicks for the purpose of being transported over its, the defendant's, railroad; that the said defendant was a connecting carrier with and for the said United States Post Office Department; that the defendant, through its officers, agents and servants, carelessly and negligently caused said chicks to be delayed in shipment, and negligently caused the same, while being so delayed, if you find they were delayed, to be confined in a hot room without ventilation, whereby the said chicks were caused to be injured and to die, then your verdict should be for the plaintiff in sum as you shall believe and find from the evidence was the reasonable market value of the chicks that died, plus the difference in the market value of chicks that did not die, if any, at the time they were delivered to the defendant, if you find they were so delivered and their reasonable market value after their confinement and damage by the defendant, if you find they were so damaged, not exceeding the sum of two hundred eighty-two and no-100 dollars, ($282.00), . . ."
The instruction is not open to the charge brought against it. Finding no reversible error in the case, we are constrained to affirm the judgment. It is so ordered. All concur.