Aetna Insurance Company, Appellee, v. Illinois Central Railroad Company, Appellant.

Gen. No. 38,211.

528

Opinion filed February 11, 1936.  Rehearing denied and opinion slightly modified February 24, 1936.

JOHN W. FREELS and HERBERT J. DEANY, both of Chicago, for appellant; EDWARD C. CRAIG and VERNON W. FOSTER, both of Chicago, of counsel.

STEVENS, CARRIER & GRIFFITH, of Chicago, for appellee; MELVIN L. GRIFFITH and GEORGE M. STEVENS, JR., of counsel.

MR. PRESIDING JUSTICE SCANLAN delivered the opinion of the court.

An action in case, in which plaintiff sued as the assignee of a claim the Continental Illinois Bank & Trust Company, of Chicago, Illinois (hereinafter called Continental Bank), had against defendant, growing out of the loss it sustained through a shipment by registered mail, via defendant's railroad, of $21,974 in currency, which was lost or stolen while in the care, custody and control of defendant.  Plaintiff had issued a policy to the bank insuring it against loss on shipments by registered mail of certain specified valuables, including paper money, and it paid to the bank the amount it had suffered through the loss, and in consideration of the payment the bank assigned to plaintiff all its right, title and interest in and to the lost property.  The case was tried by the court and there was a finding in favor

of plaintiff in the sum of $21,974. Defendant has appealed from a judgment entered upon the finding.

Defendant makes no point as to the declaration save that the affidavit in support of it was not signed by a proper party.

The material facts in the case are practically undisputed. Continental Bank held a policy issued by plaintiff insuring it "For account of whom it may concern, in case of loss to be paid to assured or order," on shipments by registered mail, including paper money. On August 28, 1929, City National Bank, of Herrin, Illinois, sent the following telegram to Continental Bank:

"Send to Franklin County Coal Company Royalton Illinois to reach them Friday noon $5600 fifties $10760 twenties $3030 tens $1465 fives $1119 ones total $21974." The same day a package containing $21,974 in the denominations specified in the telegram was made up by employees of Continental Bank and it was then registered by said bank at the post office in Chicago, under Registry No. 761968, and plaintiff was immediately notified of the character and amount of the shipment, by what is called a declaration. Henry C. Holland, a post office employee, inserted the package in rotary pouch No. R-7935-141, which is a special type of mail pouch. On August 30, 1929, the package came into the hands of John W. Neville, a United States railway postal clerk, who had taken the oath prescribed by law for all persons employed in the United States post office department, and who worked on defendant's train No. 625, between Pinckneyville and Eldorado, Illinois. He received the package from the railway postal clerk on defendant's train No. 225, running from St. Louis to Carbondale and Memphis. At the time Neville received the package it was in good condition and the number of the rotary was the same as when it left Holland's custody. Neville placed the package, together with four other registered packages, in what is known

as a lock pouch that was going to Royalton, Illinois. Before locking the lock pouch Neville was careful to see that all of the packages for Royalton were contained therein. He testified that the rotary pouch was then inside the lock pouch and in good condition. He made up what is known as a registry dispatch receipt card, on one side of which he made entries of all of the registered packages going to Royalton, including the rotary lock pouch from Chicago. On the same side of the card there was a blank for the signature of the postmaster at Royalton, which blank when signed constituted a receipt from the postmaster to Neville, the railway mail clerk, for the registered packages entered on the card. On the opposite side of the card Neville entered his own name and address, and inclosed the card in the lock pouch and then locked it. When train No. 625 stopped at Christopher its mail car stood opposite the baggage car on defendant's train No. 925 that ran between Christopher and Royalton and which was then standing at the station. Neville threw the lock pouch to John L. O'Neal, the baggageman on train No. 925, and the latter "threw it into the Royalton pile" in his baggage car. O'Neal testified that they stacked the mail, express and baggage in the baggage car in "any place we could get them"; that he stacked the two lock pouches "over with . . . the rest of the Royalton mail." He further testified that as baggageman on train No. 925 he had charge of the mail, that he had never taken an oath as a carrier of the mail for the United States government, that he received his entire pay from defendant, and that he received all directions as to his work from the officials of defendant company. There were two lock pouches, in the baggage car, for Royalton, the one received from Neville and one that had been made up at Christopher; also eight or twelve mail sacks for the same place. O'Neal testified that he did not notice whether the lock pouch for Royalton was locked or not; "it was nothing to me whether it was locked or not.

I just stacked it over. That was Neville's business, the locking of it. . . . No key to the lock pouches was ever issued to me." A pouch contains letters and other very valuable mail, and a sack contains parcel post and second class mail. O'Neal further testified that he was furnished no information as to the contents of lock pouches and did not know what they contained; that he did not know that registered mail was carried in lock pouches. The train between Christopher and Royalton ran over a branch line. There was but one train daily. There was no railway mail car attached to it and no railway mail clerk nor government agent aboard it to take charge of the mail which was carried in what is called "closed pouch service." There was no mail car service between Christopher and Royalton. The one "run" daily between the two places was called, by the employees, the "jitney." Between Christopher and Zeigler the only persons who were in the baggage car at any time were O'Neal; Richardson, the expressman; Norton, the brakeman, and the station agent at Zeigler, who rode in the car from some place in the Zeigler yards to his station. The train left Christopher about 11:55 a. m. and reached Zeigler about 12:15 p. m. O'Neal was in the baggage car at all times on the run from Christopher to Zeigler. The baggage car had a door on each side and also an end door. That car, a passenger coach and one or two freight cars made up the train. The end door of the baggage car was next to the passenger coach. The side doors were open. When the train reached Zeigler Richardson unloaded the express and immediately went home for luncheon, O'Neal unloaded the mail for that place, and the brakeman, Norton, attended to the passengers who got off there. The crew, acting under orders, then picked up some freight cars and set out the freight cars that had been attached to the train at Christopher. The entire train crew, save the conductor, Harris, assisted in the work, which required 10 or 15 minutes' time, during which

the conductor was at the rear end of the train flagging a highway crossing. During the work none of the crew paid any attention to the baggage car or the mail, and none looked into the baggage car after they again boarded the train. The procedure followed by the crew that day was the usual one that had been followed at Zeigler for seven years prior to that time. When the train left Zeigler, O'Neal, Norton and Harris got on at the rear. Richardson stayed in Zeigler. The train backed out from Zeigler to Mitchell Junction at a speed of from six to fifteen miles an hour. It stopped at a crossing about a quarter of a mile from the Zeigler station and then proceeded to Mitchell Junction, and from Mitchell Junction to Royalton. Mitchell Junction is about two miles from the Zeigler station and Royalton is about five miles from Mitchell Junction. O'Neal, Norton and Harris rode on the rear of the passenger coach until the train reached a point just outside of Royalton, where a carload of props for a mine were ''set out.'' At that point O'Neal went back to the baggage car. Until then none of the crew had been in that car since the train reached Zeigler, and none had been assigned to watch the mail during that period of time. When the train pulled into Royalton, O'Neal threw off the mail for that place. The postmaster, Livingston, received it at the train and took it to the post office. The train then proceeded back to Zeigler and Herrin, and when it reached the Zeigler yard office O'Neal was called into that office to answer a telephone call from the station agent at Royalton. The latter informed O'Neal that there had been a robbery of the mails; that the postmaster at Royalton had told him that about $22,000, which should have been in the mail, had been stolen. Upon the card which Neville had inclosed in the lock pouch, Livingston receipted for all of the packages listed by Neville on the card except rotary lock pouch No. R-7935-141, which he noted as not received. Ernest Bowman, an employee of defendant for a num-

ber of years and who had worked as baggageman in charge of the mail on the run between Christopher and Royalton, was arrested a few days after the robbery. He was indicted on two counts, one for conspiring to rob the mail and another for robbing the mail of the package in question, and was convicted on the conspiracy count and found not guilty on the other count. At the trial of Bowman, O'Neal testified that a few months prior to the robbery Bowman rode from Christopher to Zeigler in the baggage car and sat on the mail sacks. It further appeared that Bowman was acquainted with the manner in which the train that carried the payroll of the Franklin County Coal Co. was handled at Zeigler. He was "laying off duty" on the day of the robbery, and was seen in Zeigler on August 29, 1929. The rotary lock pouch in which the registered package had been placed at the Chicago post office was found, in October, 1929, about a half mile from the Zeigler station, in a concrete culvert in the Zeigler yards of defendant. The pouch had been cut in two and the registered package abstracted. All of the witnesses testified that no one tampered with the mail between Christopher and Zeigler, and from the facts in proof it is evident that the robbery occurred after the train arrived at Zeigler and while the entire crew was absent from the baggage car. It appears that Bowman was able to execute the robbery without detection because he had worked as a baggageman in charge of the mail on the run between Christopher and Royalton and was familiar with the long-standing, careless custom of handling the baggage car at Zeigler. The Herrin bank and the Coal Company notified Continental Bank that the money had not been received, and the latter bank made "a duplicate shipment" of the same amount of money to the Coal Company. After the robbery plaintiff paid Continental Bank $21,974 for the loss the latter had sustained through the robbery, and at the same time plaintiff and Continental Bank entered into an

agreement whereby it was stipulated that in case the money was not found Continental Bank would execute a proper assignment to plaintiff of its right, title and interest in and to the currency. Thereafter Continental Bank executed such an instrument. No part of the currency in question was ever recovered, and plaintiff has never been reimbursed for the money it paid to said bank except the sum of $50 received from the United States government under the provisions of a certain statute. All of the train crew, including O'Neal, who was in charge of the mail at the time of the loss, were employees of defendant and paid by it. None had ever taken the oath prescribed by law for persons employed in the post office department. Defendant was carrying the mail on the Christopher-Royalton route under an authorization from that department, dated February 1, 1929, and its compensation for the service was fixed by the authorization. Defendant proved that in March, 1930, the United States government post office department levied a fine of $50 against it, the reason assigned by the department for the fine being: ''Train 925: theft of pouch of mail while in custody of the Company for delivery at Royalton, Ill., account lack of protection, Aug. 30, 1929.''

Defendant offered evidence to support its claim that it used care in the selection of the employees who composed the train crew at the time the loss occurred. Plaintiff earnestly contends that this evidence fails to show that sufficient care was taken in the selection of the employees in the first instance, and that defendant's records show that each of the said employees, on occasions, had been careless and negligent in the performance of duties and had received demerit marks from defendant for such negligence. Plaintiff further contends that defendant offered no evidence to rebut the allegation in the declaration and plaintiff's proof that defendant failed to properly supervise and superintend the employees in question.

Plaintiff's claim is not based upon the theory of privity or of interest in the contract between defendant and the United States government, but upon the ground of tort liability, and the declaration is predicated upon that theory. Plaintiff concedes that the established rule in this country is that an officer of the post office department is only liable to the owner of mail matter for injury due to his own personal default in the discharge of his duties, and that he is not liable for the default of a subordinate officer or servant in the public employment, but contends that "the persons in charge of the registered mail package . . . at the time of its loss at Zeigler, Illinois, were the private employees of the defendant and were not in any sense the employees, agents or officers of the United States Government or the post office department," and that "defendant owed to plaintiff a duty to exercise reasonable care and caution in safeguarding and protecting the registered mail package to prevent its loss and to insure its safe delivery," and that plaintiff is entitled (under the facts and circumstances in evidence) "to judgment against the defendant . . . for the value of the lost currency." Defendant concedes that the members of the train crew "had not taken any oath given by the Postal Department," and that that department "had nothing to do with their appointment or employment." In its reply brief defendant states that "no claim has ever been made that any member of the train crew was an 'officer' of either the Government or the Post Office Department, but only that in handling the mail they were 'lent servants' of the Post Office Department," and that "while engaged in any way in handling the mail they were temporarily the servants of the Post Office Department and not the private employes of the defendant"; also that "a mail contractor is a public agent and is not responsible for the omission, negligence or misfeasance of those employed under it when it has employed trustworthy persons of suitable skill and abil-

ity," and has not co-operated in the wrong. In our opinion the major question for us to determine is: Is there, as plaintiff contends, a distinction in the law between the case of an officer of the post office department sought to be charged with the default of a subordinate in the public service, and the case of a carrier of mail under contract with the United States government sought to be charged for the result of the negligence of its servants who were not in the service of the post office department and were not under the direction or control of a government agent at the time?

In support of its position defendant cites the following cases: *Denton v. Yazoo & M. V. R. Co.*, 284 U. S. 305; *Conwell v. Voorhees,* 13 Ohio 523, 543; *Hutchins v. Brackett,* 22 N. H. 252; *Boston Ins. Co. v. Chicago, R. I. & P. Ry. Co.*, 118 Iowa 423, 435; *Bankers' Mutual Casualty Co. v. Milwaukee, St. P. & S. S. M. Ry. Co.*, 117 Fed. 434, 442; *Foster v. Metts & Co.*, 55 Miss. 77, and *Lane v. Cotton,* 1 Ld. Raym. 646.

Defendant contends that the train crew had charge of the mail at Zeigler and were, therefore, agents of the government, because they were furnished to the government, as required by the regulations of the postmaster general, and that the case falls within the rule laid down in *Denton v. Yazoo & M. V. R. Co., supra.* In that case the mail was being transported by the railroad company under a regulation of the postmaster general, adopted by authority of the statute, which regulation provides:

"Section 1293. . . . 2. Railroad companies shall furnish the men necessary to handle the mails, to load them into and receive them from the doors of railway post office cars, and to load and pile the mails in and unload them from storage and baggage cars, under the direction of the transfer clerk, or clerk in charge of the car, if one is on duty, except as provided in Section 1290. Mails intended for delivery to postal clerk shall

never be placed in a postal car unless there is a clerk on duty to receive and care for them.''

There the employees of the railroad, at the time of the injury in question, were assisting in handling the mail *under the direction of a railway mail clerk.* Section 1293 requires the presence of a government agent whenever railroad employees aid in the work contemplated by the section. As stated in the opinion (309–10):

''They (railroad carriers) are not required to handle, load or receive mail matter, but only to furnish the men necessary for those purposes. The men so furnished handle the mails and load them into, and receive them from, the railway post office cars, as the regulation prescribes, *'under the direction of the transfer clerk, or clerk in charge of the car.'* . . . Obviously, as the evidence shows, a direction by the transfer clerk carries with it the duty, on the part of the men directed, to obey, and has, and was intended to have, the force of a command.'' (Italics ours.)

The court held that under the particular facts of that case the defendant railroad was not liable for the injuries to the plaintiff resulting from the negligence of one of its employees while the latter was engaged in so loading mail, because his work at the time was work of the government that was being done under the direction and control of a government agent. The regulation of the postmaster general applicable to the facts in that case does not apply to the facts of the instant case. Here there was no mail car nor postal clerk on the train in question, and no government agent in charge of the mail which was being carried by defendant under ''closed pouch mail service,'' and the post office regulalations covering such service contemplate the ''transportation and handling by railroad employees of the mail.'' It seems obvious to us that the *Denton* case is not an authority in support of defendant's position and, inferentially, at least, the opinion, is against it, for if

defendant's "lent servant" doctrine is sound, it was entirely unnecessary for the court to base its decision upon the theory that the railroad employees, at the time of the accident, were doing government work under the direction and control of a government agent.

All of the other cases cited by defendant are urged in support of its contention that "a mail contractor is a public agent and is not responsible for the omission, negligence or misfeasance of those employed under it when it has employed trustworthy persons of suitable skill and ability."

*Conwell v. Voorhees, supra,* decided in 1844, held that the owners and proprietors of a stage coach, who had contracted for the carriage of United States mail, were not liable to plaintiff for loss of a letter containing money, upon the ground that such contractors were public agents and not responsible for the omissions, negligence or misfeasance of those employed under them, where they had employed trustworthy persons of suitable skill and ability and had not co-operated in the wrong. *Hutchins v. Brackett, supra,* decided in 1850, is based upon the *Conwell* case.

In *Sawyer v. Corse,* 17 Gratt. 230, decided in 1867, the Virginia court had before it a case that involved the liability of a contractor carrying the mail for the loss of a letter containing bank notes, due to the negligence of his private agent or servant, it appearing that the servant was selected, employed and paid by the contractor, was under his direction and control, worked for his benefit and profit, and could be discharged by him at pleasure. In an able and exhaustive opinion, the court, after reviewing the cases bearing upon the question before it, held that though the contractor "may be said to be, in a certain sense, an agent of the government, because he is engaged in working for the government, yet the laborers and others whom he employs under him, in the execution of his contract, cannot be said to be agents of the government, which does not know them,

does not appoint them, does not control them, does not pay them, and has nothing to do with them." To quote from the opinion:

"Two cases have been cited as expressly sustaining the proposition that a mail contractor is not responsible for the loss of a mail through the misfeasance or negligence of a carrier. The first of them is *Conwell v. Voorhees*, 13 Ohio R. 523. The court stated the question to be whether the contractor was a common carrier or a public agent, although the declaration, in all the counts, set forth misfeasance and negligence, and not the liability of a common carrier, as the ground of action. The court held that he was a public agent, on the ground that he was engaged in the performance of a public service, under a contract with the government, and was therefore not responsible for the misfeasance or negligence of those employed by and under him. For the reasons already given, I do not think that this decision can be supported. The editor of American Leading Cases, vol. 1, p. 621, intimates the opinion that the case cannot be sustained on the ground upon which it was placed by the court, and that if it can be sustained at all, which he evidently doubts, it must be on the ground that the carrier holds an official situation, and is really in the employment of the post office department.

"The other case relied upon is *Hutchins v. Brackett*, 2 Foster's R. 252. That case, though put upon the authority of *Conwell v. Voorhees*, was really decided upon a ground not relied upon, or even mentioned by the court in that case, to wit: that the carrier was a public agent, engaged in the performance of a public duty, and not the mere servant of the contractor. It will be observed that in *Conwell v. Voorhees* the judge uses 'mail carrier' in the sense of 'mail contractor' (p. 542, line 15), and that the judge in *Hutchins v. Brackett* misquotes the opinion in *Conwell v. Voorhees* by substituting 'mail carrier' for 'mail contractor,'

where it occurs in the 24th line of p. 542. Thus the court in *Conwell v. Voorhees* is represented as holding that a mail *carrier* is a public agent, when, in point of fact, they held only that a mail *contractor* is such.

"It thus appears that *Hutchins v. Brackett* affords no support to *Conwell v. Voorhees,* and I think it clear that *Hutchins v. Brackett* cannot be sustained on the ground upon which it was put. But however that may be, that ground, as I have shown, is not applicable to this case, in consequence of the fact that the carrier had not been duly sworn, and in consequence of the special stipulations of the contract between the contractor and the department."

The court held that the mail contractor was liable to third persons for losses sustained through the negligence or default of his agent in the performance of his duties.

In *Central Railroad & Banking Co. v. Lampley,* 76 Ala. 357, to which case we will again refer, the court discusses the *Conwell* and *Hutchins* cases and disapproves conclusions reached in them.

In *Barker v. Chicago, P. & St. L. Ry. Co.,* 243 Ill. 482, our Supreme Court had before it the question as to whether a postal clerk, injured through the negligence of a railroad company in operating the train on which the clerk was engaged in the discharge of his duties, could recover damages from the railroad company for such injuries. In answer to the contention that the company was a public agency performing a government function and therefore not liable for the negligence of its employees, the court expressed the view that the company was not a public officer or agent, but a contractor for the government for the performance of a special service, and that the same reason did not exist for holding it exempt from liability for the defaults of those who acted under it in the public service as agents of the government, and the court, after citing with ap-

proval *Sawyer v. Corse, supra,* and *Central Railroad & Banking Co. v. Lampley, supra,* states:

"Several cases have been cited which have held that a mail contractor is not liable for the loss of property transmitted by mail and lost through the carelessness of the contractor's servants. They are *Conwell v. Voorhees,* 13 Ohio, 526, *Hutchins v. Brackett,* 22 N. H. 252, *Boston Ins. Co. v. Chicago, Burlington and Quincy Railroad Co.,* 118 Iowa, 423, and *Banker's Mutual Casualty Co. v. Minneapolis, St. Paul & Sault Ste. Marie Railway Co.,* 117 Fed. Rep. 434. These cases proceed upon the theory that mail contractors are public agents and not responsible for the omissions, negligence or misfeasance of those employed by them. We think the cases which hold the contrary are supported by the sounder reason."

It must be noted that our Supreme Court, in the above quotation, expressly disapproves of the reasoning in four of the cases upon which defendant relies.

*Conwell v. Voorhees, supra,* is reported in 42 Am. Dec. 206 (published in 1886), and following the opinion, in an annotation reviewing the cases bearing upon the responsibilities of mail contractors and mail carriers, the annotator states (209):

"Mail Contractors and Mail Carriers.—The case of mail contractors and their liability for the acts of their subalterns presents a more difficult question, and one upon which the authorities do not agree. The principal case (*Conwell v. Voorhees*) was followed by that of *Hutchins v. Brackett,* 2 Foster, 252; but the correctness of these cases has been doubted by able writers: Sherman & Redf. on Neg., sec. 182; Whart. on Neg., sec. 296; 1 Am. L. Cas. 785, 5th ed."

On page 210 the annotator further states that upon reason and principle the doctrine announced in *Sawyer v. Corse* appears to be the better one and meets with the approval of some able writers.

It is a sufficient answer to *Bankers' Mutual Casualty Co. v. Milwaukee, St. P. & S. S. M. Ry. Co., supra,* and *Boston Ins. Co. v. Chicago, R. I. & P. Ry. Co., supra,* that our Supreme Court disapproves of the reasoning and holding in those cases. We may add, however, that in the *Bankers' Mutual* case the decision is based upon the old rule that applies to postal officers, the court finding that the station agent through whose negligence the package was lost was engaged in the discharge of a public function, although the evidence showed that he had not been sworn in as an official or employee of the post office department, was not appointed or recognized by it, and was in no way under its direction or control. The Iowa court cites with approval the *Conwell* and *Hutchins* cases, apparently not knowing that these cases had been criticized and disapproved by other courts and by able writers. Neither the *Bankers' Mutual* nor the *Boston Ins. Co.* case considered the question as to possible tort liability distinct from the liability assumed by contract with the government.

While *Foster v. Metts & Co., supra,* favors the views expressed in *Conwell v. Voorhees* and *Hutchins v. Brackett,* and disapproves *Sawyer v. Corse,* it is well to note that the facts in the *Foster* case differ materially from the facts in the instant case. In the *Foster* case the money of the plaintiff was stolen from the mail by Woodfin, *a mail carrier,* employed by the defendants to carry the mail. To quote from the opinion:

"A carrier of the mail is required by law to be of a certain age, to take a prescribed oath, is exempted from militia and jury service, and is liable to certain penalties for violations of duty, as well as subject to be discharged from service by any postmaster, in a certain contingency. He is a *subordinate agent of the government,* whose employment is contemplated and provided for by the government in contracting to have the mail carried. *Ib. (U. S. v. Belew,* 2 Brocken. 280.)"

While the defendants in that case employed and paid the mail carrier, the latter was clearly a subordinate agent of the government, viz., a mail carrier sworn into the government service. The opinion assumes that the mail carrier was an assistant of the postmaster, and, as we read the facts, it was entirely unnecessary for the court to base its ruling upon the *Conwell* and *Hutchins* cases.

*Lane v. Cotton, supra,* cited by defendant, was decided in 1701, and is reviewed in *Sawyer v. Corse, supra.* It was the earliest case to state the rule that the postmaster general of England is a public officer, not accountable for the misconduct of subordinates who, though they may be appointed by him, are officers of the postal department. *Dunlop v. Munroe,* 11 U. S. 242, is the earliest American case upon the subject. (See also *Raisler v. Oliver,* 97 Ala. 710.)

*Central Railroad & Banking Co. v. Lampley, supra,* seems to be the first case that involved the liability of a railroad company, as a carrier of mail, to the owner of mail matter for its loss or destruction due to the negligence of the servants of the company. Lampley sued to recover damages *for the alleged conversion of $225 in money,* which he had sent by mail inclosed in a registered letter which never reached its destination. The pouch containing the letter was strapped and locked by the postmaster and delivered to an employee of the defendant, a train-hand or porter. It seems to have been the custom of the post office at that time to deliver mail pouches to and receive them from employees of the defendant. While the mail was being carried on the defendant's train it was not in charge of any route agent or official of the post office department, the pouches being placed in the baggage car. The conductor, the only person on the train who appears to have been charged with any duty regarding the mail pouches, was not a postal official. The court held *that the action*

*for conversion would not lie,* as there was no evidence tending to show that the defendant was guilty of any wrongful disposition or appropriation or withholding of the letter other than the failure to deliver it; but on the question as to whether the defendant would be liable for loss of the letter *by the negligence or want of care of defendant's servants,* the court approved the doctrine announced in *Sawyer v. Corse, supra,* and disapproved *Conwell v. Voorhees* and *Hutchins v. Brackett.* In its opinion the court states (366):

"The mail-pouches were carried on the baggage in the baggage-car, to which persons employed on the train had access, and neither the conductor, nor any one else, had been sworn as a mail-carrier. It was held in *Bishop v. Williamson,* 2 Fairf. 295, that the postmaster was liable for the acts of one whom he permitted, without having been sworn, to have the care and custody of the mail in his office. Such person was said to be acting as the agent or servant of the postmaster.

"The regular and usual business of the defendant was a carrier of passengers and goods. Its railroad was, by law, an established post-road; and by direction of the post-office department, was carrying the mails between Eufaula and Clayton. The agents and servants on the train were not employed for the special business of transporting the mails. They were employed in the general business of transportation, and, under such employment, were used in the incidental service of carrying the mail matter. Being thus generally engaged, the rendering such general service, as the private agents and servants of the defendant, the incidental service in carrying the mails does not impart to them the character of public agents and servants."

*Pryor Brown Transfer Co. v. Gibson,* 154 Tenn. 260, 290 S. W. 33, follows the reasoning and ruling of our Supreme Court in *Barker v. Chicago, P. & St. L. Ry. Co., supra.* After a review of the cases bearing upon

the question before it the Tennessee Supreme Court held that a transfer company, having a contract with the government for transportation of mail, was liable for negligence of its driver of a mail truck, and rejected the contention that both transfer company and driver were agents of the government, and that, therefore, the company was exempt from liability for negligence of its subordinate. In 51 A. L. R. 193, where the *Pryor* case is reported, there is an extended annotation in which many cases bearing on the question before the Tennessee court are reviewed. The annotator states (200):

"However, the cases holding the contractor liable for the negligent acts of his employees, in carrying the mails, under the doctrine of respondeat superior, are supported by the better reasoning."

A recent case bearing directly upon the instant question is *Skaggs v. Missouri-Kansas-Texas R. Co.*, 228 Mo. App. 808, 73 S. W. (2d) 302, decided July 2, 1934. Defendant concedes that it sustains plaintiff's position, but it argues that because the decision of the Kansas City Court of Appeals was not reviewed by the Missouri Supreme Court it should have little weight, especially in view of the cases cited by defendant. In the *Skaggs* case the plaintiff shipped by United States mail 4,700 chickens to Kansas City and St. Louis markets. They were accepted by the postmaster at Nevada, Missouri, and stamped to be handled by the carrier as first class mail. The shipment was delivered to the station agent of the railroad company for transportation on a particular train to the addressees, but the station agent neglected to get them on that train. The chickens were placed in the baggage room and practically the entire lot died from heat and lack of water. The railroad company advanced the same defense that defendant does here. It was contended that the chickens were in transportation by United States mail, and

while engaged in such transportation the company was neither a private nor a common carrier, but an agent of the government, and no privity of contract existed between the plaintiff and the defendant. It is evident, from the able opinion, that the case was well argued on both sides. In affirming a judgment for plaintiff the court said (306–7):

"It is no doubt true that Skaggs, the owner of the chicks and the one who suffered the loss occasioned by the death of the chicks arising out of their being improperly handled by the baggageman and other station agents of the railway company in charge of its depot at Nevada, had no contract with the railway company for the transportation of the chicks. But this case is not founded upon the violation of an express contractual obligation, but for a breach of a public duty whereby Skaggs suffered the direct personal loss sued for. *Sawyer v. Corse,* 17 Grat. (Va.) 230, 94 Am. Dec. 445, 447. This case holds that a contractor with the Post Office Department for the carrying of the mail is liable to a third person for a loss occasioned by negligence in the performance of his, or its, duties, or for a loss caused by the negligence of a mere private agent and servant employed by the contractor-carrier to assist in performing the details of such contracted carriage. See, also, *Pryor Brown Transfer Co. v. Gibson,* 154 Tenn. 260, 290 S. W. 33, 51 A. L. R. 193; *Central Railroad, etc., Co. v. Lampley,* 76 Ala. 357, 52 Am. Rep. 334; *Raisler v. Oliver & Co.,* 97 Ala. 710, 12 So. 238, 38 Am. St. Rep. 213; *Barker v. Chicago, Peoria, etc., R. Co.,* 243 Ill. 482, 90 N. E. 1057, 26 L. R. A. (N. S.) 1058, 134 Am. St. Rep. 382; *Mellor v. Missouri Pac. Ry. Co.,* 105 Mo. 455, 16 S. W. 849, 10 L. R. A. 36.

"We are not herein attempting to subvert the rule, well established by the decisions of many courts, that a public officer or other governmental agency is not responsible for the acts or omissions of a subordinate,

who also serves the government. But this rule cannot be invoked by a person or corporation undertaking by contract to render a service for the government for a compensation to be paid to it, and the negligence complained of is committed by its subordinates who are employed and paid by it and liable to be discharged at its pleasure. In the case at bar, the railway company is not a public officer nor an officer of the government, though in a certain sense an agent of the government engaged in the work of carrying the mails for a compensation due it, but the baggageman who negligently caused the loss was not an agent of the government. Whose work was the baggageman doing when he carelessly failed to load the chicks on the train and then still more negligently put the chicks in a close and suffocating place where it could reasonably be apprehended that they would die or be so injured as to cause the remainder not yet dead to die thereafter? Who was the master at the very time of the negligent act? The answer to both of these questions is, the M. K. & T. Railway Company. The petition alleges these facts, and although it states that the railway company was a common carrier, yet the negligence charged is that the servants of the railway negligently failed to promptly place the subjects to be transported on the train and then negligently placed them in the baggageroom under such conditions as to cause their death.''

After a very careful consideration of the important question before us we have reached the conclusion that under the particular facts and circumstances in this record and the principles of law applicable to the same, the position of defendant cannot be sustained. In our judgment the old rule that a postmaster is a public officer and not accountable for the misconduct of subordinates, who, though they may be appointed by him, are officers of the postal department, was never intended to cover a case like the present one. In *Barker*

*v. Chicago, P. & St. L. Ry. Co., supra,* our Supreme Court stated that the reason for the exemption of postmasters from responsibility for the negligence or positive wrongs of their subordinates in the discharge of their public duties, arises from considerations of public policy, but that (486–7):

"The appellant (railroad company), however, is not a public officer or a public agent. It is a contractor with the government for the performance of a special service, viz., the carrying of the mail, and the same reason does not exist for holding it exempt from liability for the negligence of its servants as for holding the post-master general or a post-master exempt from liability for the defaults of those who act under them in the public service, as agents of the government."

The court further states that the considerations that exempted the postal officials from liability "do not apply to a corporation undertaking, by contract, to perform work or render service for the government for a compensation to be paid to it and with a view to its own profit, and where its subordinates are employed and paid by it and liable to be dismissed at its pleasure," and the court quotes with approval the following from *Sawyer v. Corse, supra:*

"Such a contractor is in no just and proper sense an officer of the government, and though he may be said to be in a certain sense an agent of the government because he is engaged in working for the government, yet the laborers and others whom he employs under him in the execution of his contract cannot be said to be agents of the government, which does not know them, does not appoint them, does not control them, does not pay them and has nothing to do with them. He is not a public agent, because he is working for his own profit by fulfilling a contract which he has bound himself to perform and for which he is to receive compensation."

The regular and usual business of defendant was that of a carrier of passengers and goods, and the train crew was employed in its general service. Defendant paid them and had the sole right to employ them and to discharge them. It is conceded that there was no mail car service between Christopher and Royalton, that there was no mail clerk or government agent in charge of the mail in question, and that none of the train crew had ever taken any oath prescribed by law for persons employed by the post office department. The mail was being carried under a post office regulation that contemplated the "transportation and handling by railroad employees of the mail." The following facts show that the post office department did not recognize O'Neal as its officer or agent. He received the mail in question at Christopher from Neville, the regular mail clerk on train No. 625, the latter not requiring a receipt from O'Neal. When O'Neal's train reached Royalton he handed the mail to the postmaster at that place, but the latter receipted for it to Neville. O'Neal did not even handle the postmaster's receipt. O'Neal testified that, *as baggageman,* he had charge of the mail and that all of the directions he ever received as to his work came from the officials of defendant company. Whatever care he gave to the mail was but incidental to his general work as baggageman. He testified that he was given no information as to the contents of lock pouches and that he had no knowledge as to what was in them; that he did not even know that registered mail was carried in lock pouches. He excused his failure to notice if the lock pouches that he received from Neville were locked, upon the ground, to use his own words, "That was Neville's (the regular mail clerk on train No. 625) business, the locking of it"; "it was nothing to me whether it was locked or not." He further testified that he was never given a key to the lock pouches. Indeed, it appears from

O'Neal's testimony that he handled the mail as he did ordinary baggage. It is not without some significance that the train crew at the time of the robbery was engaged in ordinary railroad work that had no connection with the mail. As it clearly appears that the post office department neither controlled nor directed any work of the train crew in connection with the mail, defendant is forced to contend that the members of the train crew must be regarded as "lent servants," although there is no evidence to support such a theory. In our opinion the mere fact that mail was carried in the baggage car did not impart to the train crew the character of servants or agents of the post office department. The money in question was lost through the gross negligence of defendant's servants, and we feel impelled to say that its bold contention that plaintiff has no redress for the great loss it has sustained does not, in view of the facts, appeal to our sense of justice. Plaintiff's contention that O'Neal and the other members of the train crew were, at the time of the loss of the registered mail pouch, the private employees of defendant, and were not the employees, agents or officers of the United States government or the post office department and that therefore the doctrine of *respondeat superior* applies to the case, is, in our judgment, sound.

In our determination of this case we have not deemed it necessary to consider plaintiff's contention that defendant did not exercise sufficient care in the selection of the members of the train crew in the first instance and that it retained them after the records of the company showed they had been careless and negligent in the performance of their duties; nor have we deemed it necessary to consider plaintiff's further contention that the evidence shows that defendant failed to properly supervise and superintend the manner in which the train crew performed their duties, and that its fail-

ure in that regard proximately contributed to bring about the robbery.

Defendant has raised and argued, in its brief, several other points, but upon the oral argument its counsel conceded that it relied principally upon its major contention and that it did not place great reliance upon the other points raised. However, we will consider the additional points.

Defendant contends that "where the Post Office Department imposes a fine upon a railroad mail contractor for alleged delinquencies, its action in so doing constitutes an election of remedies and exhausts the only remedy available," and "the government, having levied a ($50) fine against the railroad, has elected the remedy it desired to pursue. This remedy was an exclusive remedy and exhausted the rights of the Government or any one else against the railroad." The trial court sustained a demurrer to the third special plea of defendant, which alleged the same defense asserted in the instant contention, and defendant argues that this action of the court constituted reversible error. In support of its position defendant cites *United States v. Atlantic Coast Line R. Co.*, 215 Fed. 56, which involved an appeal from a judgment entered by a District judge. (See *United States v. Atlantic Coast Line R. Co.*, 206 Fed. 190.) The Circuit Court of Appeals sustained the holding of the District judge that *because of the contract between the parties* and the facts, the postmaster general intended the fine as an exclusive remedy. But the government is not a party to this proceeding, and plaintiff's right of action, if it has one, is not based upon the theory of any privity of contract, or because of any interest that it may have in any contract between the carrier and the government, but upon the ground of tort liability, and we hold that the contention of defendant is not a meritorious one.

Defendant contends that "the Court was without jurisdiction to hear this cause, since plaintiff in bringing its suit as assignee in its own name had failed to file the affidavit required by Section 18 of the Practice Act," and that this court should enter judgment in favor of defendant. The affidavit attached to the declaration is signed by "Melvin L. Griffith," and alleges that he "is one of the attorneys" for plaintiff, "a corporation." The declaration, with an affidavit attached, was filed on April 23, 1931. No demurrer was interposed, but on July 21, 1931, a plea of the general issue was filed. The case was called for trial on April 19, 1934, and the new Practice Act applies. On July 5, 1934, after the evidence for both sides had been closed, defendant, by leave of court, filed four special pleas, none of which alleged any defect in the declaration or questioned the jurisdiction of the court to hear the cause. At the close of plaintiff's case defendant moved for a finding in its favor, and as one of the grounds for such motion alleged that the affidavit was not in conformity with section 18 of the Practice Act because made by one of plaintiff's attorneys. Defendant cites section 18 of the old Practice Act. Section 22, par. 150, of the New Practice Act reads as follows:

"The assignee and owner of a non-negotiable chose in action may sue thereon in his own name, and he shall in his pleading on oath, allege that he is the actual *bona fide* owner thereof, and set forth how and when he acquired title. . . . "

The above section is the same, in substance, as section 18 of the old act. Defendant argues that section 18 is in derogation of the common law and must be strictly construed. Section 4, par. 132, of the new Practice Act provides:

"This Act shall be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive rights of the parties, and the rule that statutes in derogation of the

common law must be strictly construed shall not apply to this Act or to the rules made pursuant thereto. . . . ''

Even under the old Practice Act the principle stated by defendant did not apply. (See *Chicago, B. & Q. R. R. Co. v. Dunn,* 52 Ill. 260, 263.) *Fingado v. Wilson Braiding & Embroidering Co.,* 205 Ill. App. 267; *Allis-Chalmers Mfg. Co. v. City of Chicago,* 297 Ill. 444, and *Gallagher v. Schmidt,* 313 Ill. 40, cited by defendant, do not apply to the instant case. Here the plaintiff is a corporation and acts through its officers and agents. If defendant desired to raise the point it now raises it should have made a motion to strike the declaration. The argument that the declaration is fatally defective merely because the affidavit was signed by one of plaintiff's attorneys does not appeal to us.

Defendant contends that ''there being a variance in the evidence between the pleadings and the proof, and no evidence whatever in the record on one of the essential elements of plaintiff's case, the trial court should have found for the defendant.'' As defendant failed to raise, in the trial court, the question of alleged variance it is precluded from raising it here. As to the point that there is no evidence on one of the essential elements of plaintiff's case, it appears that George H. Hansen, who was ''in charge of the shipping cage'' of Continental Bank, was the man who shipped the money to the Franklin Coal Company at Royalton. Defendant, by inadvertence, calls Hansen ''a bank teller.'' Upon *cross-examination* the following occurred: ''Mr. Freels (attorney for defendant): Q. Now, who was charged with this money shipment, the City National Bank? A. Of Herrin, Illinois, yes, sir. Q. And when you made up the parcel, you charged their account $21,974.00? A. Yes, sir. Q. And from the time that you made up the parcel and charged their

account, that amount of money, that money belonged to them, didn't it? A. It did." Defendant now contends that because of this testimony we should hold "that the money was not the property of the Continental Illinois Bank & Trust Company, as alleged, but of the City National Bank of Herrin." In view of the entire evidence it is somewhat difficult to take this contention seriously. The skilful question propounded to the witness called for a purely legal conclusion, and the answer amounted to no more than that. Moreover, it was, as plaintiff argues, an erroneous conclusion. In defendant's brief it argues that because of Hansen's testimony the money belonged to City National Bank of Herrin. In its reply brief it argues that the money belonged to Franklin County Coal Company, the consignee. That Continental Bank was the owner of the money that was shipped cannot be reasonably disputed. Its dealings were with the City National Bank of Herrin. The latter bank directed it to send the money to the Coal Company at Royalton. Through the gross negligence of defendant the money was not delivered, and after the Herrin Bank and the Coal Company had notified Continental Bank that the money had not been received the latter bank made "a *duplicate* shipment" of the same amount of money to the Coal Company, and plaintiff, under its policy issued to Continental Bank, paid to the latter the amount of the loss it had sustained. Could Continental Bank have held the Herrin bank for the money that was never delivered? Could the Herrin bank have held the Coal Company for the money that it never received? We are satisfied from a careful examination of the facts and circumstances that plaintiff made out a *prima facie* case that the money belonged to it, and if defendant seriously questioned the bank's owner-

ship it had full opportunity to offer evidence bearing upon the ownership. It did not do so.

After a careful consideration of the facts and circumstances bearing upon defendant's further contention that except for certain incompetent evidence, admitted over objection of defendant, there would have been no connection shown between the currency shipment made up in Chicago on August 29, 1929, and any shipment which was ever handled between Christopher and Royalton, we find no merit in it.

Nor do we find any merit in defendant's contention that the court erred in sustaining the demurrer to each of its four special pleas. The first alleged that the mail was being transported by the United States government through its post office department; the second alleged that the men handling the mail were on the occasion in question not employees of the railroad company but of the post office department; the third alleged that the $50 fine levied by authority of the postmaster general for the acts and omissions set up in the declaration constituted an exclusive remedy and exhausted the only legal remedy available to the government or anyone else; the fourth alleged that the carriage and handling of mail, including the registered parcel referred to in plaintiff's declaration, was solely and exclusively the privilege, duty or function of the United States government. The trial court admitted all of the evidence offered by defendant in support of its special pleas, which, as we have heretofore stated, were filed after all of the evidence had been heard, but before judgment, and the trial court did not pass upon the demurrers until just before the entry of the judgment. Defendant, in the lower court and here, has had a full consideration of the defenses set up in the special pleas, and if we are right in our conclusion upon the main question in the case, it follows that the trial

556

court did not err in sustaining the demurrers to the special pleas.

The judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

SULLIVAN and FRIEND, JJ., concur.